AES:SPN/LHE:JEA:CJN
F. #2015R01670

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA | I N F O R M A T I O N |
| - against - | Cr. No. 21cr273 (PKC) |
| BANK JULIUS BAER & CO. LTD., | (T. 18, U.S.C., §§ 1956(h), 982(a)(1), 982(b)(1) and 3551 et seq.; T. 21, U.S.C., § 853(p)) |
| Defendant. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE UNITED STATES CHARGES:

At all times relevant to this Information, unless otherwise stated:

I.  The Defendant and Relevant Individuals and Entities

1. From in or about and between February 2013 and May 27, 2015 (the "relevant period"), the defendant BANK JULIUS BAER & CO. LTD. ("BJB" or "the Bank") was a multinational financial services company organized and based in Zurich, Switzerland. During the relevant period, the stock of BJB's parent company was listed on the SIX Swiss Exchange, and the Bank was supervised by the Swiss Financial Market Supervisory Authority.

2. Jorge Luis Arzuaga was an Argentine national and, in or about and between June 2012 and May 2015, was a relationship manager in the Bank's offices in Montevideo, Uruguay and Zurich, Switzerland. From approximately 2001 to 2012, Arzuaga worked as a relationship manager at other Swiss banks in Buenos Aires, Argentina and Zurich, including Swiss Bank #1 and Swiss Bank #2, entities the identities of which are known to the United States and to the Bank.

3. Supervisor #1, an individual whose identity is known to the United States and to the Bank, was, during the relevant period, employed in a supervisory role at BJB relating to South and Central America business. Supervisor #1 directly supervised Arzuaga during the relevant period.

4. Supervisor #2, an individual whose identity is known to the United States and to the Bank, was, during the relevant period, a senior supervisor at BJB with oversight responsibilities including South and Central America business. Supervisor #2 directly supervised Supervisor #1 during the relevant period and was a member of BJB's executive board.

5. Torneos y Competencias, S.A. ("Torneos") was a sports media and marketing company headquartered in Argentina, with subsidiaries and affiliates in the Cayman Islands, Netherlands, and Uruguay, among other locations. Torneos executives created and controlled off-the-books shell companies, including FPT Sports S.A. ("FPT Sports") and Arco Business and Developments Ltd. ("Arco"), to execute certain transactions with and on behalf of Torneos. Torneos maintained two accounts at BJB in the names of Arco ("the Arco Account") and FPT Sports ("the FPT Sports Account").

6. Alejandro Burzaco was a citizen of Argentina, and the controlling principal of Torneos and its subsidiaries.

7. The Fédération Internationale de Football Association ("FIFA") was an international body that governed and promoted the sport of soccer throughout the world. FIFA was organized and registered under Swiss law and headquartered in Zurich, Switzerland. FIFA was comprised of six continental confederations, various regional federations, and more than 200 member associations, each representing organized soccer in a particular nation or territory.

8. The Confederación Sudamericana de Fútbol ("CONMEBOL") was one of the six continental soccer confederations affiliated with FIFA. CONMEBOL, which was domiciled and headquartered in Paraguay, governed soccer in South America and had 10 national soccer association members. Among other tournaments, CONMEBOL organized the Copa América, Copa Libertadores, and Copa Sudamericana.

9. Soccer Official #1, an individual whose identity is known to the United States and to the Bank, was a citizen of Argentina. Soccer Official #1 was a high-ranking official of FIFA, CONMEBOL, and Asociación de Futbol Argentina ("AFA"), the Argentinian soccer federation, which was a national member association of FIFA and CONMEBOL. During 2013, Soccer Official #1 received at least $25 million in bribe payments through an account held at the Bank. Soccer Official #1 died on or about July 30, 2014.

10. Nicolás Leoz was a citizen of Paraguay. Leoz served as the president of CONMEBOL and as a member of FIFA's executive committee until approximately April 24, 2013, when he resigned from both positions, citing health issues.

11. Eugenio Figueredo was a citizen of the United States and Uruguay. Figueredo was the president of CONMEBOL from approximately April 2013 to August 2014, a member of FIFA's executive committee from approximately May 2013 to May 2015, and previously served as a vice president of CONMEBOL and president of the Uruguayan Football Association. Between approximately 2013 and 2014, Figueredo received at least $2 million in bribe payments through accounts held at the Bank.

12. Marco Polo del Nero was a citizen of Brazil. Del Nero was a member of FIFA's executive committee from approximately March 2012 to November 2015. Del Nero

also served as the president of the Confederação Brasileira de Futebol ("CBF"), the Brazilian soccer federation, from approximately April 2015 to December 2015.

13. José Maria Marin was a citizen of Brazil and maintained a residence in New York during the relevant period. Marin served as the president of the CBF from approximately March 2012 to April 2015. At various times relevant to this case, Marin was also a member of multiple FIFA standing committees, including the organizing committee for the Olympic football tournaments, as well as the organizing committees for the World Cup and the Confederations Cup, where he was a special adviser. In or about 2013, companies controlled by Marin and Marco Polo Del Nero received at least $3.9 million in bribe payments through accounts held at the Bank.

14. Romer Osuna was a citizen of Bolivia. He served as the treasurer of CONMEBOL from approximately 1986 to 2013 and also served as a member of the FIFA audit and compliance committee. In or about 2013, Osuna received at least one bribe payment in the amount of $600,000 through an account held at the Bank.

15. Sergio Jadue was a citizen of Chile who served as the president of the National Football Association of Chile and a vice president of CONMEBOL. In or about 2014, Jadue received at least one bribe payment of approximately $400,000 through an account held at the Bank.

II. The Criminal Scheme

16. During the relevant period, the Bank, through its employee Arzuaga, agreed with sports marketing executives and soccer officials to launder at least $36,368,400 in bribe payments through the United States in furtherance of a scheme in which sports marketing companies bribed soccer officials in exchange for broadcasting rights to soccer matches.

Arzuaga conspired to execute these illegal transactions using accounts at BJB, knowing that the purpose of these transactions was to conceal and disguise the proceeds of bribery, and with the intention to promote honest services wire fraud. In addition, Arzuaga knew that the funds involved represented the proceeds of some form of unlawful activity. Through the aforementioned actions, Arzuaga intended, at least in part, to benefit the Bank, which realized fees and profits from the conduct described herein. Arzuaga's supervisors at BJB (Supervisor #1 and Supervisor #2) approved certain transactions through these accounts, despite significant red flags—including knowing that Arzuaga was using fake documentation to justify at least one payment to relatives of a soccer official. Furthermore, Bank personnel failed to properly investigate and address indicia of money laundering and red flags in connection with the accounts involved in the money laundering and bribery schemes.

17. Arzuaga willfully joined the money laundering and bribery schemes by enabling his clients Alejandro Burzaco and Torneos to use accounts at the Bank to pay bribes in furtherance of those schemes, including use of the Arco Account and the FPT Sports Account.

18. Arzuaga left Swiss Bank #1 in approximately June 2012 to accept a position at BJB. When BJB hired Arzuaga, he began to transfer client bank accounts from Swiss Bank #1 to newly opened accounts at BJB. Supervisor #2 directed members of the Latin America private banking team to "make sure that the subject accounts were opened as soon as possible, meaning immediately," and stated that they could "count on [his] No Objection to be 'fast tracked.'" Supervisor #2 added, "Having 38 new accounts is what we are paid for and a good stress to have. Please use support from other teams if required. I can't accept mourners in times like we are leaving [sic]." The Bank followed Supervisor #2's directive to expedite the account openings, despite the fact that a number of the accounts Arzuaga was bringing to the

Bank were held in the names of or beneficially owned by individuals or entities associated with international soccer, which was generally understood to involve high corruption risks.

19. Arzuaga opened the Arco Account at BJB on or about October 31, 2012. Prior to that time, Torneos primarily used an account in the name of Arco held at Swiss Bank #1 to pay bribes. On or about December 11, 2012, shortly after opening the Arco Account, Arzuaga also opened the FPT Sports Account. Arzuaga understood that Torneos was using the Arco Account and FPT Sports Account to pay bribes to soccer officials.

A. The Copa Libertadores Laundering

20. BJB conspired to launder bribes from Torneos to soccer officials for the rights to the Copa Libertadores tournaments. Beginning in or about 2005, Alejandro Burzaco acquired a minority ownership interest in Torneos and began to manage the company's day-to-day operations. From approximately 1999 to 2015, a Torneos affiliate, T&T Sports Marketing Ltd., held exclusive worldwide broadcasting rights to the Copa Libertadores, an annual tournament of club teams in the member nations of CONMEBOL. Burzaco continued Torneos's multi-year practice of paying bribes to CONMEBOL officials to obtain broadcasting rights to the Copa Libertadores.

21. Burzaco and Torneos paid bribes through BJB to numerous soccer officials in furtherance of this scheme, including Soccer Official #1, Eugenio Figueredo, Marco Polo Del Nero, José Maria Marin, Romer Osuna and Sergio Jadue. Torneos sent more than $30 million of these bribes and off-the-books payments from the Arco Account and the FPT Sports Account between approximately 2013 and March 2015. These payments were sent from or through accounts in the United States.

  B.  The World Cup Laundering

  22. Between approximately 2010 and 2013, Alejandro Burzaco and co-conspirators agreed and arranged to pay Soccer Official #1, who was the president of AFA and the senior vice president of FIFA, approximately $30 million for his support in the award of regional broadcasting rights to Torneos for four World Cups in 2018, 2022, 2026 and 2030. Arzuaga transferred approximately $25 million of this money into a sub-account associated with the FPT Sports Account (the "FTP Sports Sub-Account") and held it there for Soccer Official #1.

  C.  The FPT Sports Account Laundering

  23. BJB conspired to launder bribes from Torneos to soccer officials through the FPT Sports Account and the FPT Sports Sub-Account. Torneos laundered approximately $29,137,000 in bribes and other improper payments out of the FPT Sports Account at BJB from in or about 2013 through March 2015. Several of these payments were made through accounts held in the United States. The FPT Sports Account laundering included the following conduct.

  a. Due to the difficulty of transferring funds directly to Soccer Official #1 without attracting unwanted scrutiny, Arzuaga advised Alejandro Burzaco to open a sub-account to the main FPT Sports account at Swiss Bank #1 to separately hold Soccer Official #1's bribes. The purpose of putting the funds into a sub-account, rather than the main account, was to conceal the funds while enabling Torneos to receive bank statements (that it could show to Soccer Official #1) to confirm that the payments were made. Arzuaga also opened the FPT Sports Sub-Account at BJB. As with the sub-account at Swiss Bank #1, the purpose of the FPT Sports Sub-Account was to hold and help launder bribes Torneos paid to Soccer Official #1. Arzuaga transferred money from the FPT Sports sub-account at Swiss Bank #1 into the FPT Sports Sub-Account at BJB and held it there for Soccer Official #1.

    b.  The FPT Sports Sub-Account at BJB was funded with bribe proceeds sent via wire transfers on or about April 11, 2013, several of which were sent to or from the United States. For example, on or about April 11, 2013, Broadcasting Company Affiliate A, an affiliate of a major broadcasting company headquartered in Latin America whose identity is known to the United States and to the Bank, transferred $7.25 million from its account at a bank in New York to the FPT Sports Account. Torneos then transferred the funds on the same day to the FPT Sports Sub-Account. This payment was a portion of a $15 million bribe to Soccer Official #1 for his support in the award of broadcasting rights for the 2026 and 2030 World Cups.

    c.  In furtherance of the World Cup money laundering and bribery scheme, Arzuaga met with Soccer Official #1 on several occasions, including on at least one occasion when he received instructions from Soccer Official #1 about how to invest the assets in the FPT Sports Sub-Account.

    d.  To conceal the origins of these payments and their purpose, Arzuaga falsified certain BJB documents to conceal the true beneficial owner of the assets maintained in the FPT Sports Sub-Account and make the funds appear to belong to Torneos.

    e.  On or about July 30, 2014, Soccer Official #1 died. Following his death, Arzuaga arranged for the transfer of the bribery proceeds held in the FPT Sports Sub-Account to Soccer Official #1's heirs. On or about November 12, 2014, BJB executed a book transfer of approximately $16,567,000 from the FPT Sports Sub-Account to an account at BJB held in the name of one of Soccer Official #1's heirs ("Heir #1"), an individual whose identity is known to the United States and to the Bank. Together with counsel at Torneos, Arzuaga worked with Heir #1 to create fraudulent contracts to support the transfer to Heir #1. On or

about March 24, 2015, BJB executed a wire transfer of approximately $8 million from the FPT Sports Sub-Account, through BJB's correspondent account at a bank in New York, to an account held at another Swiss bank in the name of another of Soccer Official #1's heirs ("Heir #2"), an individual whose identity is known to the United States and to the Bank. Arzuaga advised Heir #2 to open the account at the other Swiss Bank in the name of FPT Sports in order to divert suspicion regarding the transfer.

    f. Arzuaga had multiple conversations with Supervisor #1 and Supervisor #2 about Soccer Official #1 and the funds held for Soccer Official #1 in the FPT Sports Sub-Account. Arzuaga told both Supervisor #1 and Supervisor #2 that these funds would be transferred out of the FPT Sports Sub-Account to Soccer Official #1's heirs in the wake of Soccer Official #1's death. Arzuaga also told both Supervisor #1 and Supervisor #2 about the use of a fake contract to justify the transfer to Heir #1. Notwithstanding the representations made by Arzuaga, Supervisor #1 and Supervisor #2 failed to ask additional questions, or to conduct further inquiries about the aforementioned transfer to Soccer Official #1's heirs, the fake contract, or any of the other transactions the Bank conducted on behalf of Arzuaga's soccer-related clients.

  D. The Copa América Laundering

    24. BJB also conspired to launder bribes to soccer officials for the rights to CONMEBOL's Copa América soccer tournament. From approximately 1987 to 2011, a Brazilian sports marketing company, Traffic Sports ("Traffic"), held the commercial rights to the Copa América tournament. At various times during that period, Traffic agreed to pay bribes to Nicolás Leoz and other CONMEBOL officials in exchange for their support for Traffic's position as the exclusive holder of those rights. In or about 2010, CONMEBOL terminated its

longstanding relationship with Traffic and entered into an agreement with Full Play, a sports marketing company based in Argentina. In order to win that contract, Full Play's principals, Hugo Jinkis and Mariano Jinkis, agreed to pay bribes to various CONMEBOL officials. In or around 2013, Torneos, Full Play, and Traffic entered into a settlement regarding the rights to the Copa América tournament, through which the three companies equally participated in a joint venture known as Datisa, which entered into a contract with CONMEBOL on or about May 25, 2013 granting Datisa exclusive worldwide commercial rights to the 2015, 2019, and 2023 Copa América tournaments and the 2016 Copa América Centenario, which was held in the United States (the "2013 Copa América Contract").

25. In connection with the 2013 Copa América Contract, the Datisa partners agreed to pay tens of millions of dollars in bribes to CONMEBOL officials—all of whom were also FIFA officials—including bribe payments for signing the contract and for each of the four editions of the tournament. The agreement called for bribe payments to be made to each of the "top" three CONMEBOL officials (the president of the confederation and the presidents of the Brazilian and Argentine federations), the CONMEBOL general secretary and as many as seven other CONMEBOL federation presidents. The officials who were to receive bribes included, among others, Eugenio Figueredo, Soccer Official #1, Sergio Jadue, José Maria Marin, and Marco Polo Del Nero.

26. As part of the settlement creating Datisa, José Hawilla, who was the owner of Traffic, agreed to reimburse Torneos and Full Play a total of $13.333 million for the bribes they previously paid to obtain the Copa América rights. Among other payments fulfilling that

agreement, on or about June 18, 2013, Traffic sent a wire transfer of $5 million from its account at Delta National Bank & Trust Co. in Miami, Florida to the FPT Sports Account.

27. In 2013, Torneos decided to close the shell company Arco, but the Arco Account remained open until November 2014. The FPT Sports Account then became the main vehicle for bribes, and remained open until on or about May 12, 2015.

28. As compensation for his assistance to Torneos and Alejandro Burzaco, including facilitating the payment of bribes to soccer officials, Arzuaga received cash bonuses from Torneos, including a payment in the amount of approximately $450,000 on or about January 5, 2015, which was compensation for his efforts in arranging the transfer of funds to Soccer Official #1's heirs.

III. The Bank's Compliance Failures

29. BJB's compliance department failed to adequately review the multiple financial transactions that represented the bribe payments made pursuant to these schemes and that bore significant indicia of money laundering, including facially dubious contracts and services purportedly rendered by shell corporations.

30. BJB's anti-money laundering ("AML") controls failed to detect or prevent money laundering transactions related to the soccer bribery schemes. Had Supervisor #1 or compliance personnel meaningfully reviewed Arzuaga's due diligence on Torneos and his responses to transaction alerts (which Supervisor #1 and compliance personnel were required to affirmatively approve), they would have known there were multiple, significant red flags, including facially false contracts, payments to third parties at the direction of a FIFA official, and services purportedly rendered by shell corporations—all of which would have alerted the Bank to the bribery, money laundering, or other illegal activity.

31. In addition to these compliance control failures, BJB directed "that [Arzuaga's clients'] accounts [be] opened as soon as possible, meaning immediately," with "No Objection to [their being] 'fast tracked.'" This, in the hope that these clients would provide lucrative business. In particular, when Arzuaga first joined BJB in 2012, Supervisor #2 instructed that the compliance review of Arzuaga's accounts be expedited.

32. BJB compliance also failed to appropriately investigate or address several significant indicia of money laundering in connection with the funding of an account of Heir #1. For example, in or around February 2015, following the death of Soccer Official #1, Arzuaga attempted to open an account at BJB for another of Soccer Official #1's heirs ("Heir #3"), an individual whose identity is known to the United States and to the Bank. As an initial deposit, Heir #3 attempted to deposit three checks issued by FIFA. Compliance expressed concern about accepting checks rather than wire transfers due to money laundering risk, but ultimately agreed to accept those checks.

## MONEY LAUNDERING CONSPIRACY

33. The allegations contained in paragraphs one through 32 are realleged and incorporated as if fully set forth in this paragraph.

34. In or about and between February 2013 and May 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant BANK JULIUS BAER & CO. LTD., together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds from places in the United States to and through places outside the United States, and from places outside the United States to and through places in the United States, (i) with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, in violation of Title 18, United States Code,

Section 1343 (the "Specified Unlawful Activity"), contrary to Title 18, United States Code, Section 1956(a)(2)(A), and (ii) knowing that the monetary instruments and funds involved in the transportation, transmission and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of the Specified Unlawful Activity, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION

35. The United States hereby gives notice to the defendant that, upon its conviction of the offense charged herein, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

36. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as

Case 1:21-cr-00273-PKC   Document 5   Filed 05/27/21   Page 14 of 15 PageID #: 33

14

incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p))

_____
MARK J. LESKO
Acting United States Attorney
Eastern District of New York


_____
DEBORAH L. CONNOR
Chief
Money Laundering and Asset Recovery
Section
Criminal Division
United States Department of Justice

F.#: 015R01670

FORM DBD-34
JUN. 85

No. _____

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

*vs.*

BANK JULIUS BAER & CO. LTD.,

Defendant.

# INFORMATION

(T. 18, U.S.C., §§ 1956(h), 982(a)(1), 982(b)(1) and 3551 et seq.; T. 21, U.S.C., § 853(p)))

*A true bill.*

_____
*Foreperson*

*Filed in open court this* _____ *day,*

*of* _____ A.D. 20 _____

_____
*Clerk*

*Bail,* $ _____

***Sam Nitze, Lauren Elbert, Assistant U.S. Attorneys (718) 254-7000***
***Christian Nauvel, Trial Attorney (202) 514-0350***