AES:SPN/LHE:JEA:CJN
F. #2015R01670

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

BANK JULIUS BAER & CO. LTD.,

.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

DEFERRED PROSECUTION
AGREEMENT

Cr. No.   21cr273 (PKC)

DEFERRED PROSECUTION AGREEMENT

      The defendant Bank Julius Baer & Co. Ltd. (the "Bank"), pursuant to authority granted by

the Bank's Board of Directors, reflected in Attachment B, which is incorporated by reference into

this deferred prosecution agreement (the "Agreement"), and the United States Department of

Justice, Criminal Division, Money Laundering and Asset Recovery Section and the Office of the

United States Attorney for the Eastern District of New York (collectively, the "Offices"), enter

into this Agreement.

Criminal Information and Acceptance of Responsibility

      1.    The Bank acknowledges and agrees that the Offices will file the attached one-count

criminal Information (the "Information") in the United States District Court for the Eastern District

of New York, charging the Bank with one count of money laundering conspiracy, in violation of

Title 18, United States Code, Section 1956(h).  In so doing, the Bank: (a) knowingly waives its

right to indictment on this charge, as well as all rights to a speedy trial pursuant to the Sixth

1

Court Exhibit #1
USA v. Bank Julius Baer & Co. Ltd.
21cr273 (PKC)
5/27/2021

Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) knowingly waives any objection with respect to venue to any charges by the Offices arising out of the conduct described in the Statement of Facts attached hereto as Attachment A (the "Statement of Facts"), which is incorporated by reference into this Agreement, and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Eastern District of New York. The Offices agree to defer prosecution of the Bank pursuant to the terms and conditions described below.

2.      The Bank admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the attached Statement of Facts, and that the allegations described in the Information and the facts described in the attached Statement of Facts are true and accurate. Should the Offices pursue the prosecution that is deferred by this Agreement, the Bank stipulates to the admissibility of the attached Statement of Facts in any proceeding by the Offices, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the attached Statement of Facts at any such proceeding.  In addition, in connection therewith, the Bank agrees not to assert any claim under the United States Constitution, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, Section 1B1.1(a) of the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines"), or any other federal rule that the Statement of Facts should be suppressed or is otherwise inadmissible as evidence in any form.

2

<u>Term of the Agreement</u>

3.      This Agreement is effective for a period beginning on the date on which the Information is filed and ending three (3) years from that date (the "Term").  The Bank agrees, however, that, in the event the Offices determine, in their sole discretion, that the Bank has knowingly violated any provision of this Agreement or has failed to completely perform or fulfill each of the Bank's obligations under this Agreement, an extension or extensions of the Term may be imposed by the Offices, in their sole discretion, for up to a total additional time period of one year, without prejudice to the Offices' right to proceed as provided in Paragraphs 21-23 below. Any extension of the Term of the Agreement extends all terms of this Agreement for an equivalent period.  Conversely, in the event the Offices find, in their sole discretion, that the provisions of this Agreement have been satisfied, the Offices may terminate the Agreement early.  If the Court refuses to grant exclusion of time under the Speedy Trial Act, Title 18, United States Code, Section 3161(h)(2), the Term shall be deemed to have not begun, and, all the provisions of the Agreement shall be deemed null and void, except that the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts shall be tolled from the date on which this Agreement was signed until the date the Court refuses to grant the exclusion of time plus six months.

3

Relevant Considerations

4.      The Offices enter into this Agreement based on the individual facts and circumstances presented by this case and the Bank, including:

a.      The Bank did not receive voluntary disclosure credit because it did not voluntarily self-disclose the conduct described in the Statement of Facts to the Offices until there was an imminent threat of disclosure and government investigation.   The first FIFA-related indictment was unsealed on May 27, 2015.   On that same day, the Acting U.S. Attorney for the Eastern District of New York stated that "part of our investigation will look at the conduct of the financial institutions to see whether they were cognizant of the fact that they were helping launder these bribe payments . . . ."   This statement, in conjunction with the fact that the unsealed FIFA indictment and related charging instruments specifically referenced transactions with BJB, placed the Bank on notice of a potential investigation.   On or about May 29, 2015, BJB's outside counsel spoke with Arzuaga, who admitted "some exposure" and indicated his intent to cooperate with the Offices' investigation.   Only then did BJB contact the U.S. Attorney's Office for the Eastern District of New York;

b.      The Bank did not receive cooperation credit because its cooperation did not meet the standards required under the Justice Manual.   Although BJB nominally cooperated with the Offices, it did not come forward with all evidence pertaining to the involvement of senior management, as is required by the Section 9-28.700 of the Justice Manual.   In the Offices' view, the Bank, through its representatives, made representations about relevant facts in the case that misled the Offices and had the effect of hindering the Offices' investigation.   These actions fall short of the standards required for the Bank to be considered for cooperation credit;

4

      c.    The Bank has engaged in a significant effort to remediate its historically deficient compliance program.  Although the Bank had an inadequate anti-money laundering ("AML") program and controls during the period of the conduct described in the Statement of Facts, it has already enhanced its AML program and controls.  Among other things, in 2016, BJB launched "Project Atlas," a three-year, approximately $112 million AML initiative and "Know Your Client" upgrade of all accounts held by the Bank, i.e., not just high-risk accounts, that was completed in 2019.  The Bank has also launched additional initiatives with the goal of continuing to enhance its Compliance program, including "Project Phoenix," a large-scale AML transaction monitoring and risk management program launched in 2018, and "Project Mistral," an initiative launched in 2019 aimed at strengthening the Bank's risk management and risk tolerance framework globally.  Although some of these enhancements are still incomplete and untested, the Bank has committed to continuing to improve its AML program, and the Offices view the Bank's progress as a significant step in the right direction.  As a result, the Bank has received partial credit—specifically a five percent reduction from the bottom of the Sentencing Guidelines fine range—for its remediation;

      d.    The nature and seriousness of the offense conduct, including: (1) the Bank's essential role in facilitating the bribery scheme; (2) the duration of the Bank's involvement in the offense; and (3) the involvement of two members of senior management, including one member of the Bank's executive board;

      e.    The Bank's 2016 Deferred Prosecution Agreement with the Department of Justice's Tax Division and the U.S. Attorney's Office for the Southern District of New York for criminal violations relating to its efforts to U.S. taxpayers in evading U.S. taxes; and

f.      The Bank has agreed to continue to cooperate with the Offices in any ongoing investigation of the conduct of the Bank and its officers, directors, employees, agents, and external asset managers relating to violations of U.S. money laundering laws, including as described in Paragraph 6 below.

5.      Accordingly, after considering 4(a) through (f) above, the Offices believe that an appropriate resolution of this case is a deferred prosecution agreement with the Bank; a criminal monetary penalty of $43,320,000, which reflects a five percent discount off the otherwise-applicable Sentencing Guidelines fine range; and forfeiture in the amount of $36,368,400, representing the minimum amount of bribes laundered through the Bank as part of the conspiracy. Because authorities in Switzerland have already appointed an independent compliance monitor to oversee the remediation of the Bank's AML program, the Offices have determined that the potential benefits (both to the Bank and the public) of an additional monitor are negligible, making an additional appointment unnecessary.

<u>Future Cooperation and Disclosure Requirements</u>

6.      The Bank shall cooperate fully with the Offices in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts and other conduct under investigation by the Offices at any time during the Term, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term.  At the request of the Offices, the Bank shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies in any investigation of the Bank, its subsidiaries, or its affiliates, or any of its present or former officers, directors, employees, agents, or external asset managers, or any other party, in any and all matters relating to the conduct

6

described in this Agreement and the Statement of Facts.  The Bank agrees that its cooperation pursuant to this Paragraph shall include, but not be limited to, the following:

a.      The Bank shall truthfully disclose all factual information with respect to its activities, those of its branches, representative offices, subsidiaries, and affiliates, and those of its present and former directors, officers, employees, agents, and external asset managers, including any evidence or allegations and internal or external investigations, about which the Bank has any knowledge or about which the Offices may inquire.  This obligation of truthful disclosure includes, but is not limited to, the obligation of the Bank to provide to the Offices, upon request, any document, record, or other tangible evidence about which the Offices may inquire of the Bank.

b.      Upon request of the Offices, the Bank shall designate knowledgeable employees, agents, or attorneys to provide to the Offices the information and materials described in Paragraph 6(a) above on behalf of the Bank.  It is further understood that the Bank must at all times provide complete, truthful, and accurate information.

c.      The Bank shall use its best efforts to make available for interviews or testimony, as requested by the Offices, present or former officers, directors, employees, agents, and external asset managers of the Bank.  This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, all meetings requested by the Offices, and interviews with domestic or foreign law enforcement and regulatory authorities.  Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Bank, may have material information regarding the matters being investigated or prosecuted.

d.      With respect to any information, testimony, documents, records, or other tangible evidence provided to the Offices pursuant to this Agreement, the Bank consents to any

and all disclosures, subject to applicable laws and regulations, to other governmental authorities, including United States authorities and those of a foreign government, of such materials as the Offices, in their sole discretion, shall deem appropriate.

7.     In addition to the obligations in Paragraph 6, during the Term, should the Bank learn of any plausible evidence or allegation of a violation of U.S. federal law by the Bank, its employees, officers and/or directors, the Bank shall report such evidence or allegation to the Offices within thirty (30) days.  Sixty (60) days before the Term expires and again on the date that the Term expires, the Bank, represented by the Bank's Chief Executive Officer and Chief Compliance Officer, shall certify to the Offices that it has met its disclosure obligations pursuant to this Agreement.  Each certification shall be deemed a material statement and representation by the Bank to the executive branch of the United States in the Eastern District of New York for purposes of 18 U.S.C. §§ 1001 and 1519.

8.     All of the Bank's obligations pursuant to this Agreement, including, but not limited to, those set forth in Paragraphs 6, 7, 17 and 18, as well as those in Attachment C, are subject, to the extent applicable, to Swiss laws and regulations, including, but not limited to, Swiss confidentiality, criminal laws, data protection laws and regulations, and Swiss financial markets supervisory laws and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Bank must provide to the Offices a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Bank bears the burden of establishing the validity of any such assertion.

<u>Payment of Monetary Penalty</u>

9.      The Offices and the Bank agree that application of the Sentencing Guidelines to

determine the applicable fine range yields the following analysis:

a.      The November 1, 2015 version of the U.S.S.G. is applicable to this matter.

b.      <u>Offense Level</u>

| | |
|---|---|
| Base Offense Level:<br>(U.S.S.G. §§ 2S1.1(a)(2) and 2B1.1(b)(1)(L)) | 30 |
| Plus:  Conviction under Section 1956<br>(U.S.S.G. § 2S1.1(b)(2)(B)) | +2 |
| Plus:  Sophisticated laundering<br>(U.S.S.G. § 2S1.1(b)(3)) | +2 |
| <u>Total Offense Level:</u> | <u>34</u> |

c.      <u>Culpability Score</u>

| | |
|---|---|
| Base Score:<br>(U.S.S.G. § 8C2.5(a)) | 5 |
| Pervasive Tolerance/High-Level Personnel<br>(more than 1,000 employees) (U.S.S.G. § 8C2.5(b)(2)) | +4 |
| Cooperation, Acceptance<br>(U.S.S.G. § 8C2.5(g)(3)) | -1 |
| <u>Total Culpability Score:</u> | <u>8</u> |

d.      <u>Fine</u>

| | |
|---|---|
| Base Fine (U.S.S.G. § 8C2.4(a)(1))<br>(Amount of Laundered Funds) | $28,500,000 |
| Multipliers (U.S.S.G. § 8C2.6) | 1.6 – 3.2 |
| Total Fine Range (U.S.S.G. § 8C2.7) | $45,600,000 – $91,200,000 |

9

The Bank agrees to pay $43,320,000 (the "Total Criminal Fine"), which will be paid as a criminal fine by the Bank, as part of this Agreement.  The Total Criminal Fine will be paid to the United States Treasury within ten (10) business days of the filing of the Information in connection with this Agreement.  The Bank and the Offices agree that this penalty is appropriate given the facts and circumstances of this case, including the Relevant Considerations described in Paragraph 4 of this Agreement.  The Total Criminal Fine is final and shall not be refunded.  Furthermore, nothing in this Agreement shall be deemed an agreement by the Offices that the Total Criminal Fine is the maximum penalty that may be imposed in any future prosecution, and the Offices are not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Offices agree that under those circumstances, it will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment.  The Bank acknowledges that no tax deduction may be sought in connection with the payment of any part of the Total Criminal Fine.  The Bank shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the penalty or forfeiture amounts that the Bank pays pursuant to this Agreement or any other agreement entered into with an enforcement authority or regulator, concerning the facts set forth in the attached Statement of Facts.

Forfeiture

10.     The Bank acknowledges that money and property is subject to forfeiture, as a result of its violation of Title 18, United States Code, Section 1956(h), as alleged in the Information.  Pursuant to Title 18, United States Code, Sections 982(a)(1) and 981(a)(1)(A), and Title 28, United States Code, Section 2461(c), the Bank consents to the forfeiture of the sum of thirty-six million

10

three hundred sixty-eight thousand four hundred dollars and no cents ($36,368,400.00) (the "Forfeiture Amount"), which represents the minimum amount of the bribes laundered through the Bank, as property, real or personal, involved in the Bank's violation of Title 18, United States Code, Section 1956(h).

11.     The Bank shall pay the Forfeiture Amount, plus any associated transfer fees, within ten (10) business days of the filing of the Information in connection with this Agreement, in accordance with payment instructions provided by the Offices in their sole and exclusive discretion.  The Bank hereby releases any and all claims that it may have to the Forfeiture Amount, agrees that the forfeiture of such funds may be accomplished either administratively or judicially at the Offices' election, and waives the requirements of any applicable laws, rules, or regulations governing the forfeiture of assets, including those requiring notice of forfeiture.  If the Offices seek to forfeit the Forfeiture Amount judicially, the Bank waives all requirements pertaining to forfeiture set forth in Title 18, United States Code, Section 983, including the filing of a civil forfeiture complaint as to the Forfeiture Amount and notice of the same, and consents to entry of an order of forfeiture directed to such funds.  If the Offices seek to forfeit the Forfeiture Amount administratively, the Bank consents to the entry of a declaration of forfeiture and waives the requirements of Title 18, United States Code, Section 983 regarding notice of seizure in non-judicial forfeiture matters.

12.     The Bank agrees to sign any additional documents necessary to complete forfeiture of the Forfeiture Amount.  The Bank also agrees that it shall not file any petitions for remission, restoration, or any other assertion of ownership or request for return relating to the Forfeiture Amount, or any other action or motion seeking to collaterally attack the seizure, restraint,

forfeiture, or conveyance of the Forfeiture Amount, nor shall it assist any others in filing any such claims, petitions, actions, or motions.

13.     The Bank acknowledges that it shall not claim, assert, or apply for, either directly or indirectly, any tax deduction, tax credit, or any other offset with regard to any U.S. federal, state, or local tax or taxable income in connection with the payment of any part of the Forfeiture Amount.   The Bank shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source with regard to the Forfeiture Amount that the Bank pays pursuant to the Agreement or any other agreement entered into with an enforcement authority or regulator concerning the facts set forth in the attached Statement of Facts.  This provision is not intended to relate to derivative claims that have been or may be brought on behalf of the Bank.

14.     The Bank acknowledges that its payment of the Forfeiture Amount is final and shall not be refunded should the Offices later determine that the Bank has breached this Agreement and pursue a prosecution against the Bank.  In the event of a breach of this Agreement and subsequent prosecution, the Offices shall not be limited to seeking forfeiture of the Forfeiture Amount; provided, however, that in the event of a subsequent breach and prosecution, the Offices shall recommend to the Court that the Forfeiture Amount paid by the Bank pursuant to this Agreement be applied towards any forfeiture that the Court might impose as part of its judgment.  The Bank acknowledges that such a recommendation will not be binding on the Court.

12

<u>Conditional Release from Liability</u>

15.     Subject to Paragraphs 21-23, the Offices agree, except as provided in this Agreement, that they will not bring any criminal or civil case against the Bank or any of its direct or indirect affiliates, subsidiaries, or joint ventures, relating to any of the conduct described in the attached Statement of Facts or the Information filed pursuant to this Agreement.  The Offices, however, may use any information related to the conduct described in the attached Statement of Facts against the Bank:  (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

        a.      This Agreement does not provide any protection against prosecution for any future conduct by the Bank or any of its branches, representative offices, or direct or indirect affiliates, subsidiaries, or joint ventures.

        b.      In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Bank.

<u>Corporate Compliance Program</u>

16.     The Bank represents that it has implemented and will continue to implement an AML program designed to prevent and detect violations of all applicable AML laws, including U.S. money laundering statutes, throughout its operations, including those of its affiliates, subsidiaries, joint ventures, agents, and external asset managers.

17.     To address any deficiencies in its AML program, the Bank represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its

13

obligations under this Agreement, a review of its existing AML controls, policies, and procedures, as well as its compliance with applicable AML laws.  Whenever necessary or appropriate, the Bank agrees to adopt new AML controls, policies, and procedures to ensure that it maintains a rigorous AML program designed to effectively detect and deter violations of money laundering statutes (including those of the United States) as applicable.  As set forth in Attachment C, the Bank agrees that it will report to the Offices annually during the Term regarding remediation and implementation of its AML measures ("AML reports").  For the duration of this Agreement, the Bank shall provide the Offices, upon request, access to any and all non-privileged books, records, accounts, correspondence, files, and any and all other documents or other electronic records, including emails, of the Bank and its representatives, agents, affiliates, and employees, relating to any matters described or identified in the AML reports.  The Offices shall have the right to interview any officer, employee, agent, or representative of the Bank concerning any non-privileged matter described or identified in the AML reports.

18.     The Bank shall promptly notify the Offices of: (a) any deficiencies, failings, or matters requiring attention with respect to the Bank's AML program identified by any regulatory authority within 30 business days of any such regulatory notice, provided that the regulatory authority has granted the Bank permission to notify the Offices; and (b) any steps taken or planned to be taken by the Bank to address the identified deficiency, failing, or matter requiring attention. The Offices may, in their sole discretion, direct the Bank to provide other reports about its AML compliance program.

### Deferred Prosecution

19.      In consideration of the undertakings agreed to by the Bank herein, the Offices agree that any prosecution of the Bank for the conduct set forth in the attached Statement of Facts be and hereby is deferred for the Term.  To the extent there is conduct disclosed by the Bank that is not set forth in the attached Statement of Facts, such conduct will not be exempt from further prosecution and is not within the scope of or relevant to this Agreement.

20.      The Offices further agree that if the Bank fully complies with all of its obligations under this Agreement, the Offices will not continue the criminal prosecution against the Bank described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire.  Within six months of the Agreement's expiration, the Offices shall seek dismissal with prejudice of the Information filed against the Bank described in Paragraph 1, and agree not to file charges in the future against the Bank based on the conduct described in this Agreement and the attached Statement of Facts.  If, however, the Offices determine during the six-month period that the Bank breached the Agreement during the Term, as described in Paragraph 21, the Offices' ability to extend the Term, as described in Paragraph 3, or to pursue other remedies, including those described in Paragraphs 21-23, remains in full effect.

### Breach of the Agreement

21.      If, during the Term, the Bank (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information, including in connection with its disclosure of information about individual culpability; (c) fails to cooperate as set forth in Paragraphs 6 and 7 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraphs 16 through 18 of this Agreement and

15

Attachment C; or (e) otherwise fails to completely perform or fulfill each of the Bank's obligations under the Agreement, regardless of whether the Offices become aware of such a breach after the Term is complete, the Bank shall thereafter be subject to prosecution for any federal criminal violation of which the Offices have knowledge, including, but not limited to, the charges in the Information described in Paragraph 1, which may be pursued by the Offices in the U.S. District Court for the Eastern District of New York or any other appropriate venue.  Determination of whether the Bank has breached the Agreement and whether to pursue prosecution of the Bank shall be in the Offices' sole discretion.  Any such prosecution may be premised on information provided by the Bank or its personnel.  Any such prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Offices prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Bank, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year.  Thus, by signing this Agreement, the Bank agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year.  In addition, the Bank agrees that the statute of limitations as to any violation of federal law that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Offices are made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

22.     In the event the Offices determine that the Bank has breached this Agreement, the Offices agree to provide the Bank with written notice of such breach prior to instituting any prosecution resulting from such breach.  Within thirty days of receipt of such notice, the Bank shall have the opportunity to respond to the Offices in writing to explain the nature and circumstances of such breach, as well as the actions the Bank has taken to address and remediate the situation, which explanation the Offices shall consider in determining whether to pursue prosecution of the Bank.

23.     In the event that the Offices determine that the Bank has breached this Agreement: (a) all statements made by or on behalf of the Bank to the Offices or to the Court, including the attached Statement of Facts, and any testimony given by the Bank before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Offices against the Bank; and (b) the Bank shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Bank prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible.  The decision whether conduct or statements of any current director, officer, or employee, or any person acting on behalf of, or at the direction of, the Bank, will be imputed to the Bank for the purpose of determining whether the Bank has violated any provision of this Agreement shall be in the sole discretion of the Offices.

24.     The Bank acknowledges that the Offices have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Bank breaches this Agreement and this matter proceeds to judgment.  The Bank further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

Sale, Merger, or Other Change in Corporate Form of Bank

25.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Bank agrees that in the event that, during the Term, it undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Bank's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the attached Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.  The purchaser or successor in interest must also agree in writing that the Offices' ability to declare a breach under this Agreement is applicable in full force to that entity.  The Bank agrees that the failure to include these provisions in the transaction will make any such transaction null and void.  The Bank shall provide notice to the Offices at least thirty days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Offices shall notify the Bank prior to such transaction (or series of transactions) if it determines that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement.  At any time during the Term the Bank engages in a transaction(s) that has the

18

effect of circumventing or frustrating the enforcement purposes of this Agreement, the Offices may deem it a breach of this Agreement pursuant to Paragraphs 21-23 of this Agreement.  Nothing herein shall restrict the Bank from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Offices.  The requirements in this Paragraph do not apply to any internal reorganizations or restructurings of the Bank, if such changes will not circumvent, frustrate, or materially limit the enforcement purpose of the Agreement.

Public Statements by the Bank

26.     The Bank expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents, or any other person authorized to speak for the Bank, make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Bank set forth above or the facts described in the attached Statement of Facts.  Any such contradictory statement shall, subject to cure rights of the Bank described below, constitute a breach of this Agreement, and the Bank thereafter shall be subject to prosecution as set forth in Paragraphs 21-23 of this Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the attached Statement of Facts will be imputed to the Bank for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Offices.  If the Offices determine that a public statement by any such person contradicts in whole or in part a statement contained in the attached Statement of Facts, the Offices shall so notify the Bank, and the Bank may avoid a breach of this Agreement by publicly

repudiating such statement(s) within five business days after notification.  The Bank shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the attached Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the attached Statement of Facts.  This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Bank in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Bank.

27.     The Bank agrees that if it or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, the Bank shall first consult with the Offices to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Offices and the Bank; and (b) whether the Offices have any objection to the release or statement.

28.     The Offices agree, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Bank's cooperation and remediation.  By agreeing to provide this information to such authorities, the Offices are not agreeing to advocate on behalf of the Bank, but rather are agreeing to provide facts to be evaluated independently by such authorities.  Nothing in this Agreement restricts in any way the ability of the Offices, any other federal department or agency, or any state or local government from proceeding criminally, civilly, or administratively, against any current or former directors, officers, employees, or agents of the Company or against any other entities or individuals.  The parties to

this Agreement intend that the Agreement does not confer or provide any benefits, privileges, immunities, or rights to any other individual or entity other than the parties hereto.

Limitations on Binding Effect of Agreement

29.     This Agreement is binding on the Bank and the Offices but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local, or foreign law enforcement or regulatory agencies, or any other authorities, although the Offices will bring the cooperation of the Bank and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Bank.  If the Court rejects the Agreement, all the provisions of the Agreement shall be deemed null and void, and the Term shall be deemed to have not begun.

Notice

30.     Any notice to the Offices under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Chief, Bank Integrity Unit, Money Laundering and Asset Recovery Section, Criminal Division, U.S. Department of Justice, 1400 New York Ave., NW, 10th Floor, Washington, DC 20005 and Chief, Business & Securities Fraud Section, United States Attorney's Office for the Eastern District of New York, 271 Cadman Plaza E, Brooklyn, NY 11201.  Any notice to the Bank under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Bank Julius Baer & Co. Ltd., Attention:  Group General Counsel, Christoph Hiestand, Bank Julius Baer & Co. Ltd., Bahnhofstrasse 36, 8001, Zurich, Switzerland, and Juan P. Morillo, Quinn Emanuel Urquhart & Sullivan, LLP, 1300 I Street

21

NW, Suite 900, Washington, D.C. 20005.  Notice shall be effective upon actual receipt by the Offices or the Bank.

### Complete Agreement

31.     This Agreement, including its attachments, sets forth all the terms of the agreement between the Bank and the Offices.  No amendments, modifications, or additions to this Agreement shall be valid unless they are in writing and signed by the Offices, the attorneys for the Bank, and a duly authorized representative of the Bank.

**AGREED:**
**FOR BANK JULIUS BAER & CO. LTD.:**

Date: 20 May 2021                    By: _____

**Christoph Hiestand**
**Group General Counsel**
On behalf of Bank Julius Baer & Co. Ltd.

Date: 20 May 2021                    By: _____

**Juan P. Morillo**
**Quinn Emanuel Urquhart & Sullivan, LLP**
**Counsel for Bank Julius Baer & Co. Ltd.**

**FOR THE UNITED STATES DEPARTMENT OF JUSTICE:**

MARK J. LESKO                    DEBORAH L. CONNOR
**Acting United States Attorney**   **Chief**
**Eastern District of New York**    **Money Laundering and Asset Recovery Section**
                                    **Criminal Division**
                                    **United States Department of Justice**

By: _____

**Lauren H. Elbert**               **Christian J. Nauvel**
**Samuel P. Nitze**                **Trial Attorney**
**Brian D. Morris**                **Bank Integrity Unit**
**Assistant United States Attorneys**

22

**BANK OFFICER'S CERTIFICATE**

I have read this Agreement and carefully reviewed every part of it with outside counsel for Bank Julius Baer & Co. Ltd. (the "Bank"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Bank, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Bank. Counsel fully advised me of the rights of the Bank, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of the Bank. I have advised and caused outside counsel for the Bank to advise the Board of Directors fully of the rights of the Bank, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Bank, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the Group General Counsel and legal counsel for the Bank and that I have been duly authorized by the Bank to execute this Agreement on behalf of the Bank.

Date: _20 May 2021_

Bank Julius Baer & Co. Ltd.

By: _____
       Christoph Hiestand
       Group General Counsel

23

**CERTIFICATE OF COUNSEL**

I am counsel for Bank Julius Baer & Co. Ltd. (the "Bank") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Bank documents and have discussed the terms of this Agreement with the Bank's Board of Directors. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Bank has been duly authorized to enter into this Agreement on behalf of the Bank and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Bank and is a valid and binding obligation of the Bank. Further, I have carefully reviewed the terms of this Agreement with the Bank's Board of Directors and Christoph Hiestand, the Group General Counsel and legal counsel for Bank Julius Baer & Co. Ltd. I have fully advised them of the rights of the Bank, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To my knowledge, the decision of the Bank to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: 20 May 2021

By: _____

Juan P. Morillo
Quinn Emanuel Urquhart & Sullivan, LLP
Counsel for Bank Julius Baer & Co. Ltd.

**ATTACHMENT A**

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Deferred

Prosecution Agreement (the "Agreement") between the United States Department of Justice,

Criminal Division, Money Laundering and Asset Recovery Section and the United States

Attorney's Office for the Eastern District of New York (collectively the "Offices") and BANK

JULIUS BAER & CO. LTD.,  a Swiss bank ("BJB" or the "Bank").  The Bank hereby agrees

and stipulates that the following information is true and accurate.  Certain of the facts herein are

based on information obtained from third parties by the United States through its investigation

and described to BJB.  The Bank also admits, accepts, and acknowledges that under the laws of

the United States it is responsible for the acts of its officers, directors, employees, and agents as

set forth below.  Should the Offices pursue the prosecution that is deferred by this Agreement,

BJB agrees that it will neither contest the admissibility of, nor contradict, the Statement of Facts

in any such proceeding.  The following facts took place during the relevant period defined

below, unless otherwise noted, and establish beyond a reasonable doubt the charges set forth in

the Information attached to the Agreement.

## The Defendant and Its Executives and Employees

1.      From in or about and between February 2013 and May 27, 2015 (the "relevant

period"), BJB was a multinational financial services company organized and based in Zurich,

Switzerland.  During the relevant period, the stock of BJB's parent company was listed on the

SIX Swiss Exchange, and the Bank was supervised by the Swiss Financial Market Supervisory

Authority.

2.      Jorge Luis Arzuaga was an Argentine national and, in or about and between June 2012 and May 2015, was a relationship manager in the Bank's offices in Montevideo, Uruguay and Zurich, Switzerland.  From approximately 2001 to 2012, Arzuaga worked as a relationship manager at other Swiss banks in Buenos Aires, Argentina and Zurich, including Swiss Bank #1 and Swiss Bank #2, entities the identities of which are known to the Offices and to the Bank.

3.      Supervisor #1, an individual whose identity is known to the Offices and to the Bank, was, during the relevant period, employed in a supervisory role at BJB relating to South and Central America business.  Supervisor #1 directly supervised Arzuaga during the relevant period.

4.      Supervisor #2, an individual whose identity is known to the Offices and to the Bank, was, during the relevant period, a senior supervisor at BJB with oversight responsibilities including South and Central America business.  Supervisor #2 directly supervised Supervisor #1 during the relevant period and was a member of BJB's executive board.

### Sports Marketing Companies and Executives

5.      Torneos y Competencias, S.A. ("Torneos") was a sports media and marketing company headquartered in Argentina, with subsidiaries and affiliates in the Cayman Islands, Netherlands, and Uruguay, among other locations.  Torneos executives created and controlled off-the-books shell companies, including FPT Sports S.A. ("FPT Sports") and Arco Business and Developments Ltd. ("Arco"), to execute certain transactions with and on behalf of Torneos. Torneos maintained two accounts at BJB in the names of Arco ("the Arco Account") and FPT Sports ("the FPT Sports Account").

6.      Alejandro Burzaco was a citizen of Argentina, and the controlling principal of Torneos and its subsidiaries.

A-2

**FIFA Entities and Officials**

7.      The Fédération Internationale de Football Association ("FIFA") was an international body that governed and promoted the sport of soccer throughout the world.  FIFA was organized and registered under Swiss law and headquartered in Zurich, Switzerland.  FIFA was comprised of six continental confederations, various regional federations, and more than 200 member associations, each representing organized soccer in a particular nation or territory.

8.      The Confederación Sudamericana de Fútbol ("CONMEBOL") was one of the six continental soccer confederations affiliated with FIFA.  CONMEBOL, which was domiciled and headquartered in Paraguay, governed soccer in South America and had 10 national soccer association members.  Among other tournaments, CONMEBOL organized the Copa América, Copa Libertadores, and Copa Sudamericana.

9.      Soccer Official #1, an individual whose identity is known to the Offices and to the Bank, was a citizen of Argentina.  Soccer Official #1 was a high-ranking official of FIFA, CONMEBOL, and Asociación de Futbol Argentina ("AFA"), the Argentinian soccer federation, which was a national member association of FIFA and CONMEBOL.  During 2013, Soccer Official #1 received at least $25 million in bribe payments through an account held at the Bank. Soccer Official #1 died on or about July 30, 2014.

10.      Nicolás Leoz was a citizen of Paraguay.  Leoz served as the president of CONMEBOL and as a member of FIFA's executive committee until approximately April 24, 2013, when he resigned from both positions, citing health issues.

11.      Eugenio Figueredo was a citizen of the United States and Uruguay.  Figueredo was the president of CONMEBOL from approximately April 2013 to August 2014, a member of FIFA's executive committee from approximately May 2013 to May 2015, and previously served

A-3

as a vice president of CONMEBOL and president of the Uruguayan Football Association. Between approximately 2013 and 2014, Figueredo received at least $2 million in bribe payments through accounts held at the Bank.

12.     Marco Polo del Nero was a citizen of Brazil.  Del Nero was a member of FIFA's executive committee from approximately March 2012 to November 2015.  Del Nero also served as the president of the Confederação Brasileira de Futebol ("CBF"), the Brazilian soccer federation, from approximately April 2015 to December 2015.

13.     José Maria Marin was a citizen of Brazil and maintained a residence in New York during the relevant period.  Marin served as the president of the CBF from approximately March 2012 to April 2015.  At various times relevant to this case, Marin was also a member of multiple FIFA standing committees, including the organizing committee for the Olympic football tournaments, as well as the organizing committees for the World Cup and the Confederations Cup, where he was a special adviser.  In or about 2013, companies controlled by Marin and Marco Polo Del Nero received at least $3.9 million in bribe payments through accounts held at the Bank.

14.     Romer Osuna was a citizen of Bolivia.  He served as the treasurer of CONMEBOL from approximately 1986 to 2013 and also served as a member of the FIFA audit and compliance committee.  In or about 2013, Osuna received at least one bribe payment in the amount of $600,000 through an account held at the Bank.

15.     Sergio Jadue was a citizen of Chile who served as the president of the National Football Association of Chile and a vice president of CONMEBOL.  In or about 2014, Jadue received at least one bribe payment of approximately $400,000 through an account held at the Bank.

A-4

## Overview of the Scheme

16.     During the relevant period, the Bank, through its employee Arzuaga, agreed with sports marketing executives and soccer officials to launder at least $36,368,400 in bribe payments through the United States in furtherance of a scheme in which sports marketing companies bribed soccer officials in exchange for broadcasting rights to soccer matches. Arzuaga conspired to execute these illegal transactions using accounts at BJB, knowing that the purpose of these transactions was to conceal and disguise the proceeds of bribery, and with the intention to promote honest services wire fraud.  In addition, Arzuaga knew that the funds involved represented the proceeds of some form of unlawful activity.  Through the aforementioned actions, Arzuaga intended, at least in part, to benefit the Bank, which realized fees and profits from the conduct described herein.  Arzuaga's supervisors at BJB (Supervisor #1 and Supervisor #2) approved certain transactions through these accounts, despite significant red flags—including knowing that Arzuaga was using fake documentation to justify at least one payment to relatives of a soccer official.  Furthermore, Bank personnel failed to properly investigate and address indicia of money laundering and red flags in connection with the accounts involved in the money laundering and bribery schemes.

## The Bank Conspired to Launder Money

17.     Arzuaga willfully joined the money laundering and bribery schemes by enabling his clients Alejandro Burzaco and Torneos to use accounts at the Bank to pay bribes in furtherance of those schemes, including use of the Arco Account and the FPT Sports Account. The Bank admits that its conduct, through the acts of its employees, as described herein, violated

Title 18, United States Code, Section 1956(h), which makes it a crime to conspire to launder monetary instruments.

18.     Arzuaga left Swiss Bank #1 in approximately June 2012 to accept a position at BJB.  When BJB hired Arzuaga, he began to transfer client bank accounts from Swiss Bank #1 to newly opened accounts at BJB.  Supervisor #2 directed members of the Latin America private banking team to "make sure that the subject accounts were opened as soon as possible, meaning immediately," and stated that they could "count on [his] No Objection to be 'fast tracked.'" Supervisor #2 added, "Having 38 new accounts is what we are paid for and a good stress to have. Please use support from other teams if required.  I can't accept mourners in times like we are leaving [sic]."  The Bank followed Supervisor #2's directive to expedite the account openings, despite the fact that a number of the accounts Arzuaga was bringing to the Bank were held in the names of or beneficially owned by individuals or entities associated with international soccer, which was generally understood to involve high corruption risks.

19.     Arzuaga opened the Arco Account at BJB on or about October 31, 2012.  Prior to that time, Torneos primarily used an account in the name of Arco held at Swiss Bank #1 to pay bribes.  On or about December 11, 2012, shortly after opening the Arco Account, Arzuaga also opened the FPT Sports Account.  Arzuaga understood that Torneos was using the Arco Account and FPT Sports Account to pay bribes to soccer officials.

*The Copa Libertadores Laundering*

20.     BJB conspired to launder bribes from Torneos to soccer officials for the rights to the Copa Libertadores tournaments.  Beginning in or about 2005, Alejandro Burzaco acquired a minority ownership interest in Torneos and began to manage the company's day-to-day operations.  From approximately 1999 to 2015, a Torneos affiliate, T&T Sports Marketing Ltd.,

A-6

held exclusive worldwide broadcasting rights to the Copa Libertadores, an annual tournament of club teams in the member nations of CONMEBOL.  Burzaco continued Torneos's multi-year practice of paying bribes to CONMEBOL officials to obtain broadcasting rights to the Copa Libertadores.

21.     Burzaco and Torneos paid bribes through BJB to numerous soccer officials in furtherance of this scheme, including Soccer Official #1, Eugenio Figueredo, Marco Polo Del Nero, José Maria Marin, Romer Osuna and Sergio Jadue.  Torneos sent more than $30 million of these bribes and off-the-books payments from the Arco Account and the FPT Sports Account between approximately 2013 and March 2015.  These payments were sent from or through accounts in the United States.

### The World Cup Laundering

22.     Between approximately 2010 and 2013, Alejandro Burzaco and co-conspirators agreed and arranged to pay Soccer Official #1, who was the president of AFA and the senior vice president of FIFA, approximately $30 million for his support in the award of regional broadcasting rights to Torneos for four World Cups in 2018, 2022, 2026 and 2030.  Arzuaga transferred approximately $25 million of this money into a sub-account associated with the FPT Sports Account (the "FPT Sports Sub-Account") and held it there for Soccer Official #1.

### The FPT Sports Account Laundering

23.     BJB conspired to launder bribes from Torneos to soccer officials through the FPT Sports Account and the FPT Sports Sub-Account.  Torneos laundered approximately $29,137,000 in bribes and other improper payments out of the FPT Sports Account at BJB from in or about 2013 through March 2015.  Several of these payments were made through accounts held in the United States.  The FPT Sports Account laundering included the following conduct.

a.      Due to the difficulty of transferring funds directly to Soccer Official #1 without attracting unwanted scrutiny, Arzuaga advised Burzaco to open a sub-account to the main FPT Sports account at Swiss Bank #1 to separately hold Soccer Official #1's bribes.  The purpose of putting the funds into a sub-account, rather than the main account, was to conceal the funds while enabling Torneos to receive bank statements (that it could show to Soccer Official #1) to confirm that the payments were made.  Arzuaga also opened the FPT Sports Sub-Account at BJB.  As with the sub-account at Swiss Bank #1, the purpose of the FPT Sports Sub-Account was to hold and help launder bribes Torneos paid to Soccer Official #1.  Arzuaga transferred money from the FPT Sports sub-account at Swiss Bank #1 into the FPT Sports Sub-Account at BJB and held it there for Soccer Official #1.

b.      The FPT Sports Sub-Account at BJB was funded with bribe proceeds sent via wire transfers on or about April 11, 2013, several of which were sent to or from the United States.  For example, on or about April 11, 2013, Broadcasting Company Affiliate A, an affiliate of a major broadcasting company headquartered in Latin America whose identity is known to the Offices and to the Bank, transferred $7.25 million from its account at a bank in New York to the FPT Sports Account.  Torneos then transferred the funds on the same day to the FPT Sports Sub-Account.  This payment was a portion of a $15 million bribe to Soccer Official #1 for his support in the award of broadcasting rights for the 2026 and 2030 World Cups.

c.      In furtherance of the World Cup money laundering and bribery scheme, Arzuaga met with Soccer Official #1 on several occasions, including on at least one occasion when he received instructions from Soccer Official #1 about how to invest the assets in the FPT Sports Sub-Account.

A-8

d.    To conceal the origins of these payments and their purpose, Arzuaga falsified certain BJB documents to conceal the true beneficial owner of the assets maintained in the FPT Sports Sub-Account and make the funds appear to belong to Torneos.

e.    On or about July 30, 2014, Soccer Official #1 died.  Following his death, Arzuaga arranged for the transfer of the bribery proceeds held in the FPT Sports Sub-Account to Soccer Official #1's heirs.  On or about November 12, 2014, BJB executed a book transfer of approximately $16,567,000 from the FPT Sports Sub-Account to an account at BJB held in the name of one of Soccer Official #1's heirs ("Heir #1"), an individual whose identity is known to the Offices and to the Bank.  Together with counsel at Torneos, Arzuaga worked with Heir #1 to create fraudulent contracts to support the transfer to Heir #1.  On or about March 24, 2015, BJB executed a wire transfer of approximately $8 million from the FPT Sports Sub-Account, through BJB's correspondent account at a bank in New York, to an account held at another Swiss bank in the name of another of Soccer Official #1's heirs ("Heir #2"), an individual whose identity is known to the Offices and to the Bank.  Arzuaga advised Heir #2 to open the account at the other Swiss Bank in the name of FPT Sports in order to divert suspicion regarding the transfer.

f.    Arzuaga had multiple conversations with Supervisor #1 and Supervisor #2 about Soccer Official #1 and the funds held for Soccer Official #1 in the FPT Sports Sub-Account.  Arzuaga told both Supervisor #1 and Supervisor #2 that these funds would be transferred out of the FPT Sports Sub-Account to Soccer Official #1's heirs in the wake of Soccer Official #1's death.  Arzuaga also told both Supervisor #1 and Supervisor #2 about the use of a fake contract to justify the transfer to Heir #1.  Notwithstanding the representations made by Arzuaga, Supervisor #1 and Supervisor #2 failed to ask additional questions, or to conduct further inquiries about the aforementioned transfer to Soccer Official #1's heirs, the

A-9

fake contract, or any of the other transactions the Bank conducted on behalf of Arzuaga's soccer-related clients.

*The Copa América Laundering*

24.     BJB also conspired to launder bribes to soccer officials for the rights to CONMEBOL's Copa América soccer tournament.  From approximately 1987 to 2011, a Brazilian sports marketing company, Traffic Sports ("Traffic"), held the commercial rights to the Copa América tournament.  At various times during that period, Traffic agreed to pay bribes to Nicolás Leoz and other CONMEBOL officials in exchange for their support for Traffic's position as the exclusive holder of those rights.  In or about 2010, CONMEBOL terminated its longstanding relationship with Traffic and entered into an agreement with Full Play, a sports marketing company based in Argentina.  In order to win that contract, Full Play's principals, Hugo Jinkis and Mariano Jinkis, agreed to pay bribes to various CONMEBOL officials.  In or around 2013, Torneos, Full Play, and Traffic entered into a settlement regarding the rights to the Copa América tournament, through which the three companies equally participated in a joint venture known as Datisa, which entered into a contract with CONMEBOL on or about May 25, 2013 granting Datisa exclusive worldwide commercial rights to the 2015, 2019, and 2023 Copa América tournaments and the 2016 Copa América Centenario, which was held in the United States (the "2013 Copa América Contract").

25.     In connection with the 2013 Copa América Contract, the Datisa partners agreed to pay tens of millions of dollars in bribes to CONMEBOL officials—all of whom were also FIFA officials—including bribe payments for signing the contract and for each of the four editions of the tournament.  The agreement called for bribe payments to be made to each of the "top" three CONMEBOL officials (the president of the confederation and the presidents of the Brazilian and

Argentine federations), the CONMEBOL general secretary and as many as seven other CONMEBOL federation presidents. The officials who were to receive bribes included, among others, Eugenio Figueredo, Soccer Official #1, Sergio Jadue, José Maria Marin, and Marco Polo Del Nero.

26.     As part of the settlement creating Datisa, José Hawilla, who was the owner of Traffic, agreed to reimburse Torneos and Full Play a total of $13.333 million for the bribes they previously paid to obtain the Copa América rights. Among other payments fulfilling that agreement, on or about June 18, 2013, Traffic sent a wire transfer of $5 million from its account at Delta National Bank & Trust Co. in Miami, Florida to the FPT Sports Account.

27.     In 2013, Torneos decided to close the shell company Arco, but the Arco Account remained open until November 2014. The FPT Sports Account then became the main vehicle for bribes and remained open until on or about May 12, 2015.

28.     As compensation for his assistance to Torneos and Alejandro Burzaco, including facilitating the payment of bribes to soccer officials, Arzuaga received cash bonuses from Torneos, including a payment in the amount of approximately $450,000 on or about January 5, 2015, which was compensation for his efforts in arranging the transfer of funds to Soccer Official #1's heirs.

### The Bank's Compliance Failures

29.     BJB's compliance department failed to adequately review the multiple financial transactions that represented the bribe payments made pursuant to these schemes and that bore significant indicia of money laundering, including facially dubious contracts and services purportedly rendered by shell corporations.

30.     BJB's Anti-Money Laundering ("AML") controls failed to detect or prevent money laundering transactions related to the soccer bribery schemes.  Had Supervisor #1 or compliance personnel meaningfully reviewed Arzuaga's due diligence on Torneos and his responses to transaction alerts (which Supervisor #1 and compliance personnel were required to affirmatively approve), they would have known there were multiple, significant red flags, including facially false contracts, payments to third parties at the direction of a FIFA official, and services purportedly rendered by shell corporations—all of which would have alerted the Bank to the bribery, money laundering, or other illegal activity.

31.     In addition to these compliance control failures, BJB directed "that [Arzuaga's clients'] accounts [be] opened as soon as possible, meaning immediately," with "No Objection to [their being] 'fast tracked.'"  This, in the hope that these clients would provide lucrative business.  In particular, when Arzuaga first joined BJB in 2012, Supervisor #2 instructed that the compliance review of Arzuaga's accounts be expedited.

32.     BJB compliance also failed to appropriately investigate or address several significant indicia of money laundering in connection with the funding of an account of Heir #1. For example, in or about February 2015, following the death of Soccer Official #1, Arzuaga attempted to open an account at BJB for another of Soccer Official #1's heirs ("Heir #3"), an individual whose identity is known to the Offices and to the Bank.  As an initial deposit, Heir #3 attempted to deposit three checks issued by FIFA.  Compliance expressed concern about accepting checks rather than wire transfers due to money laundering risk, but ultimately agreed to accept those checks.

A-12

**ATTACHMENT B**

**CERTIFICATE OF CORPORATE RESOLUTIONS**

WHEREAS, Bank Julius Baer & Co. Ltd. (the "Bank") has been engaged in discussions with the United States Department of Justice, Money Laundering and Asset Recovery Section and the Office of the United States Attorney for the Eastern District of New York (collectively, the "Offices") regarding issues arising in relation to a conspiracy to launder bribe payments through the United States; and

WHEREAS, in order to resolve such discussions, it is proposed that the Bank enter into a certain agreement with the Offices; and

WHEREAS, the Bank's Group General Counsel, Christoph Hiestand, together with outside counsel for the Company, have advised the Management Board of the Bank of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Offices;

Therefore, the Management Board has RESOLVED that:

1.      The Bank (a) acknowledges the filing of the one-count Information charging the Bank with: (1) one count of money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h); (b) waives indictment on such charges and enters into a deferred prosecution agreement with the Offices; and (c) agrees to accept a criminal fine against Company totaling $$43,320,000, and to pay such fine pursuant to Paragraph 9 of the DPA with respect to the conduct described in the Information according to instructions provided by the Offices; and (d) agrees to pay criminal forfeiture in the amount of $36,368,400, and to pay such forfeiture pursuant to Paragraph 10 of the DPA with respect to the conduct described in the Information according to instructions provided by the Offices.

B-1

2.      The Bank accepts the terms and conditions of this Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of this Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Eastern District of New York; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts, or relating to conduct known to the Offices prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3.      Christoph Hiestand, Group General Counsel, is hereby authorized, empowered and directed, on behalf of the Bank, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by this Management Board at this meeting with such changes as he may approve;

4.      Christoph Hiestand, Group General Counsel, is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5.      All of the actions of Christoph Hiestand, Group General Counsel, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified,

confirmed, approved, and adopted as actions on behalf of the Bank.

Date: *20 May 2020*          By:     Christoph Hiestand, Group General Counsel

## ATTACHMENT C

## AML COMPLIANCE REPORTING

The Bank agrees that it will report to the Offices periodically, at no less than twelve-month intervals during a three-year term, regarding remediation and implementation of the Bank's AML compliance program, including the AML controls, policies, and procedures described in the Agreement.  During this three-year period, the Bank shall, subject to the limitations set forth in Paragraph 8 of the Agreement: (1) conduct an initial review and submit an initial report, and (2) conduct and prepare at least two follow-up reviews and reports, as described below:

a.      By no later than one year from the date this Agreement is executed, the Bank shall submit to the Offices a written report setting forth a complete description of its remediation efforts since its last update to the Offices, any planned measures reasonably designed to further improve the Bank's AML controls, policies, and its procedures for ensuring compliance with applicable U.S. or other applicable anti-money laundering laws, as well as the proposed scope of the subsequent reviews.  The report shall be transmitted to the Chief, Bank Integrity Unit, Money Laundering and Asset Recovery Section, Criminal Division, U.S. Department of Justice, 1400 New York Avenue, NW, Bond Building, Tenth Floor, Washington, DC 20530 and the Chief, Business and Securities Fraud Unit, United States Attorney's Office for the Eastern District of New York, 271 Cadman Plaza East, Brooklyn, NY 11201.  The Bank may extend the time period for issuance of the report with prior written approval of the Offices.

b.      The Bank shall undertake at least two follow-up reviews and reports, incorporating the Offices' views on the Bank's prior reviews and reports, to further monitor

and assess whether the Bank's policies and procedures are reasonably designed to detect and prevent violations of AML and other applicable anti-corruption laws.

        c.      The first follow-up review and report shall be completed by no later than one year after the initial report is submitted to the Offices. The second follow-up review and report shall be completed and delivered to the Offices no later than thirty days before the end of the Term.

        d.      The reports will likely include proprietary, financial, confidential, and competitive business information.  Moreover, public disclosure of the reports could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement.  For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Offices determine in their sole discretion that disclosure would be in furtherance of the Offices' discharge of their duties and responsibilities or is otherwise required by law.

        e.      The Bank may extend the time period for submission of any of the follow-up reports with prior written approval of the Offices.